## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SUZANA VANGJELI,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **LINWOOD BANKS, *et al.,*** | : | **No. 19-1635** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                   OCTOBER 1, 2020

Suzana Vangjeli alleges that security guard, Linwood Banks, and his employer, Triple Canopy, Inc., committed various torts when they detained and used force against her. Mr. Banks and Triple Canopy argue that they are entitled to official immunity and derivative sovereign immunity, and move for summary judgment. For the reasons that follow, the Court denies Defendants' motion.

### BACKGROUND

Triple Canopy has contracted with the Department of Homeland Security to provide security services at many federal buildings, including the Social Security Administration Card Center in Philadelphia. Linwood Banks was working as a Protective Security Officer ("PSO") when Ms. Vangjeli entered the building carrying a glass Perrier water bottle.[1] After taking the elevator to the 20th floor, she approached a Triple Canopy guard (not Mr. Banks) stationed outside of the Card Center. The guard informed Ms. Vangjeli that she could not enter with the glass water bottle. Ms. Vangjeli asked whether she could throw the bottle out in a nearby trash can, but the guard told her no. Ms. Vangjeli walked back towards the elevator and placed the water bottle out

---

[1] The altercation over a personal bottle of water that led to this lawsuit would never have inspired Paul Simon to compose a lyrical tribute to calming influences. Simon & Garfunkel, Bridge over Troubled Water (Columbia 1970).

of the guard's sight. She then returned to enter the Card Center, but the guard told her she could not come in. When Ms. Vangjeli asked why, the guard told her that she should not leave the water bottle where she did and instructed her to dispose of the bottle outside of the building.

Mr. Banks, discovering the water bottle, returned it to Ms. Vangjeli and explained that there were signs saying no glass bottles were allowed in the building. What happened next is in dispute. Defendants claim that Ms. Vangjeli began yelling and screaming, which Ms. Vangjeli denies. Mr. Banks says that he informed Ms. Vangjeli that she would have to come back the next day because she was being disruptive. Ms. Vangjeli claims that no one told her that she could not return the same day. The parties agree, however, that Ms. Vangjeli left the Card Center, took the elevator to the first floor, and disposed of the water bottle outside of the building. She then took the elevator back up to the Card Center.

Ms. Vangjeli attempted to enter the Card Center, but a guard stopped her. After Ms. Vangjeli asked to speak to a supervisor, guards escorted her to a room and instructed her to wait. One of the guards attempted to handcuff her, which Ms. Vangjeli states caused her to have a panic attack. Ms. Vangjeli fell to the floor, said she was having chest pains, and asked for an ambulance.

The guards left Ms. Vangjeli alone in the detention room. She got up from the floor, climbed into a chair, and determined after a few seconds that nobody was coming. She then left the detention area and approached the hallway leading to the Card Center to check whether anyone was calling an ambulance. Although Ms. Vangjeli denies that she was trying to leave, the guards saw her moving and interpreted it as an attempt to escape.

Ms. Vangjeli alleges that Mr. Banks tackled her into a doorway and onto the floor, causing her to hit her head and her right shoulder, and inflicting multiple injuries including a full-thickness rotator cuff tear. Mr. Banks claims that he guided her to the ground, using reasonable, necessary,

2

and appropriate force. Ms. Vangjeli responds that it was not necessary for her to be tackled and that the amount of force used was unreasonable.

## LEGAL STANDARD

A court can properly grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish

3

the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

Defendants move for summary judgment on the basis of official immunity and derivative sovereign immunity. Ms. Vangjeli disputes the applicability of both doctrines. For the reasons set out in this Memorandum, the Court finds that disputed material facts preclude granting the motion.

## I.    **Official Immunity**

Mr. Banks and his employer Triple Canopy are federal contractors, but are not themselves directly considered federal officials. In *Westfall v. Erwin*, 484 U.S. 292 (1988), "the Supreme Court held that federal officials are entitled to absolute immunity from state tort liability for acts that are: (a) discretionary in nature and (b) fall within the scope of the officials' duties." *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 174 (2d Cir. 2006). The Federal Employees Liability Reform and Tort Compensation Act superseded this test as to federal employees, "[b]ut 'the *Westfall* test remains the framework for determining when nongovernmental persons or entities are entitled to the same immunity.'" *Id.* (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 72 (2d Cir. 1998)); *see also Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 351 (3d Cir. 2012) (citing *Westfall* in holding that private Medicare contractors were entitled to immunity); *Nicole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, No. 10-389, 2011 WL 1162052, at *6 (E.D. Pa. Mar. 28, 2011) ("Immunity for federal employees is governed by the Westfall Act, but immunity for nongovernmental employees and entities acting on behalf of the government is governed by the test the Supreme Court articulated in *Westfall*.").

4

For official immunity to apply, Defendants must have been (1) carrying out a governmental function; (2) engaging in conduct that is discretionary; and (3) acting within the outer perimeter of their official duties. *Westfall*, 484 U.S. at 209-300. Here, the Vangjeli-Triple Canopy controversy turns on the scope of duty requirement. Acts fall within the outer perimeter of a contractor's official duties if they are "connected with the general matters committed by law to the contractor's control or supervision." *Nicole Med. Equip. & Supply, Inc.*, 2011 WL 1162052, at \*6. While the challenged action must "simply 'bear some reasonable relation to and connection with [the defendant's] duties and responsibilities,'" *Kumar v. Geo. Wash. Univ.*, 174 F. Supp. 3d 172, 181 (D.D.C. 2016), "the right to invoke absolute immunity evaporates when the [means used are] 'manifestly excessive,'" *Griggs v. Wash. Metro. Area Transit Auth.*, 232 F.3d 917, 922 (D.C. Cir. 2000), or if the challenged action is directly contrary to terms of a defendant's contract with the government, *see Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 717 (E.D. Va. 2009), *rev'd on other grounds sub nom.*, *Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413 (4th Cir. 2011), *on reh'g en banc*, 679 F.3d 205 (4th Cir. 2012). Both of these requirements preclude summary judgment for Defendants here. *See also Bishop v. Tice*, 622 F.2d 349, 359 (8th Cir. 1980) ("[I]mmunity is lost when a supervisor adopts means beyond the outer perimeter of his authority.").

Mr. Banks and Triple Canopy argue that they acted within the scope of their official duties because the terms of their contract with the government required security guards to "identify, report, delay, or detain persons who violate rules and regulations, as appropriate and in accordance with Post Orders." Def. Fact Statement at 2; Def. Ex. A at TC-VANGJELI-000202. They assert that it is also undisputed that Ms. Vangjeli violated the Card Center's regulation prohibiting glass

5

bottles in the Card Center offices, and that, under the contract, it was their official duty to detain her.[2]

But the Triple Canopy contract did not merely authorize the use of force; it also required Defendants to comply with the Security Manual and Resource Tool, or "SMART Book." *See* Def. Ex. A at TC-VANGJELI-000278. The SMART Book stated that PSOs could "detain a person only when absolutely necessary and use the force necessary and reasonable to control the situation." Def. Ex. B at TC-VANGJELI-000558.[3] The SMART Book also stated that "it is extremely important that you understand the different levels of force, when to use force, and what

---

[2] Ms. Vangjeli disputes whether she ever "violate[d] rules and regulations" of the Social Security Center. Defendants offer only deposition testimony to support their argument that glass containers were not allowed into the facility, and that visitors asked to leave could not re-enter on the same day. *See* Def. Fact Statement at 3. Although Defendants state that DHS Post Orders contain these requirements, they attached no copy of these Post Orders as an exhibit for the Court to examine. And this defense position is contracted by the testimony of two of Defendants' own witnesses, who stated that once a person comes into compliance with the prohibited item policy, they are allowed into the facility. *See* Def. Ex. I at 26:6-12, Def. Ex. H at 19:6-11. Indeed, the only non-testimonial evidence on this point comes from two exhibits submitted by Ms. Vangjeli. The first, the "Federal Management and Regulations," purports to govern federal facility management. *See* Pl. Reply to Fact Statement at 3-4. The second purports to be the Department of Homeland Security's "Prohibited Items Program," and applies to "all facilities or properties under the control of the General Services Administration (GSA)." *See id.*; Pl. Ex. D. Neither of these documents contain a reference to glass containers. Defendants dispute the authenticity of the Prohibited Items Program and state that it is merely a suggestion of items that facilities may prohibit. But "[t]he Third Circuit 'has not precluded reliance on unauthenticated documents to oppose a motion for summary judgment, so long as they are ultimately "reduc[ible] to admissible evidence."'" *Horton v. Nicholson*, 435 F. Supp. 2d 429, 437 (E.D. Pa. 2006) (quoting *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 329 n.6 (3d Cir. 2005)) (admitting documents "generated by government agencies" because they could be "reducible to admissible evidence at trial through a variety of techniques, including witness testimony"). Whether Ms. Vangjeli will ultimately be able to authenticate these exhibits is a question to be decided at trial or on an appropriate motion *in limine*. And even if these exhibits did not exist there would still be a genuine issue of material fact, given that Defendants cannot rely merely on the *ipse dixit* testimony of witnesses to prove the contents of the Post Orders. Defendants must produce a copy of the Post Orders themselves, along with any other appropriate evidence. *See Pankey v. Phila. Hous. Dev. Corp.*, No. CIV.A. 09-3943, 2011 WL 1161918, at *7 (E.D. Pa. Mar. 29, 2011) (on a motion for summary judgment, witness's testimony as to the contents of a policy was insufficient evidence). Although this opinion focuses on the contents of Defendants' contract with the government, this dispute of fact is an independent reason to deny defense's motion.

[3] Similarly, Triple Canopy's Use of Force directive states: "In all cases, only that force which is both Necessary and based upon Reasonable Belief may be used in any situation." Pl. Ex. B at TC-VANGJELI-000411. To the extent this quoted language is from a document that is self-designated as filed under seal, the Court exercises its case management and discretionary obligations to remove the quoted language from any supposed sealing or protective order.

level of force to use based on the situation," and that "using an 'unreasonable level' of force to detain a person could result in a [civil] lawsuit . . . being filed against you." *See* Def. Ex. B. at TC-VANGJELI-000547, -559.

A reasonable jury could find that it was not "absolutely necessary" for the guards to detain Ms. Vangjeli while they waited for Federal Protective Service representatives to arrive, to place handcuffs on Ms. Vangjeli when she was already being escorted by multiple PSOs, to prevent Ms. Vangjeli from leaving the facility when there was no reason to believe that she posed a danger to anyone inside or outside of the building, or to tackle Ms. Vangjeli into the doorway and onto the ground. And even if it was indisputably necessary to restrain Ms. Vangjeli, a jury could find that applying enough force to inflict a full-thickness rotator cuff tear on Ms. Vangjeli's right shoulder was "manifestly excessive" and, therefore, outside of the scope of Defendants' official duties. *See Griggs*, 232 F.3d at 922.

The Court's ruling is consistent with *Westfall*'s statement that immunity should be extended only if "the contribution to effective government in particular contexts outweighs the potential harm to individual citizens." *Westfall*, 484 U.S. at 299. Triple Canopy and its employees are less likely to suffer from timidity due to threats of suit than a traditional governmental entity. As a private contractor, Triple Canopy is guided by competitive market pressures. "[A] firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement, but also that a firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." *Richardson v. McKnight*, 521 U.S. 399, 409 (1997).[4]

---

[4] While *Richardson*'s holding was limited to the § 1983 context, courts conduct a similar analysis when considering whether to extend official immunity to a private company facing liability under state tort law. *See Westfall*, 484 U.S. at 299; *Hous. Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 275 (5th Cir. 2007) ("The Supreme Court has counseled that a court should not expand the scope of governmental immunity unless the interests involved greatly outweigh the costs."); *McMahon v.*

7

Furthermore, denying immunity here will not result in increased timidity in job performance. The record demonstrates that Triple Canopy and its employees already perform their duties under the perceived threat of litigation. The SMART Book warned that using an unreasonable level of force could lead to civil or criminal liability. Def. Ex. B at TC-VANGJELI-000559. Because security officers are trained to expect that they could be sued if they fail to exercise their duties in accordance with the contract, permitting such litigation to actually occur will not have a marked impact on the manner in which Triple Canopy employees execute their responsibilities.

## A.   Derivative Sovereign Immunity

Defendants claim that even if they are not entitled official immunity, they are immune from Ms. Vangjeli's tort claims under derivative sovereign immunity. The Court disagrees. "The concept of derivative sovereign immunity stems from the Supreme Court's decision in *Yearsley . . . .*" *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014) (citing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940)). *Yearsley* immunizes a government contractor if (1) the contractor's actions were "authorized and directed by the Government of the United States" and (2) "the Government's 'authority to carry out the project was validly conferred.'" *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley*, 309 U.S. at 20-21).

_____

*Presidential Airways, Inc.*, 502 F.3d 1331, 1345 (11th Cir. 2007) ("[J]ust as in the area of official immunity, the immunity of a common law agent must be affirmatively justified. Just as with a federal officer, the immunity of a private party, even if a common law agent, must be carefully tailored to protect the governmental functions the private party is exercising."); *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447 (4th Cir. 1996) ("[T]he common law immunity recognized in *Barr* and *Westfall* is afforded only to the extent that the public benefits obtained by granting immunity outweigh its costs."); *Murray*, 444 F.3d at 175 ("[T]he Supreme Court has cautioned that immunity [under *Westfall*] is appropriate only when 'the contributions of immunity to effective government . . . outweigh the . . . harm to individual citizens.'"); *Al Shimari*, 657 F. Supp. 2d at 715 (noting that official immunity should be extended to government contractors "only to the extent that the public benefits obtained by granting immunity outweigh [the] costs").

8

At the outset, Ms. Vangjeli rightly points out that derivative sovereign immunity cannot protect Mr. Banks. Derivative sovereign immunity does not immunize persons sued in their individual capacity. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1290-92 (2017). While a person sued in his or her individual capacity "may be able to assert *personal* immunity defenses" (such as official immunity), sovereign immunity will not apply unless the United States is the real party in interest. *Id.* at 1291. In this case, the United States is not the real party in interest because it is not "legally bound by the court's adverse judgment." *Id.* at 1292-93 (sovereign immunity did not shield official sued for negligence committed within the scope of his employment). *See also Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353, 365 (D.N.J. 1998) ("[O]fficials [] being sued in their individual capacities [] are not entitled to sovereign immunity."); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417 (2018) (applying *Yearsley* and differentiating *Lewis* on the basis that the defendant was "an entity rather than an individual employee").

Furthermore, there is a fundamental difference between derivative sovereign immunity and official immunity that necessarily means that both will not apply in the same case: discretion is necessary to a claim of official immunity but fatal to a claim for derivative sovereign immunity. As Defendants rightly argue here, and as noted above, official immunity requires that the alleged tortious conduct was "discretionary in nature" or "the product of independent judgment." *Westfall*, 484 U.S. at 296. The opposite is true for derivative sovereign immunity. While our appellate court has not ruled on this issue, other courts have held that derivative sovereign immunity "is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'" *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015). *See also In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 200 (2d Cir. 2008) (derivative immunity not applicable because Defendant "cites no regulations that required

9

it to engage in the precise actions of which Plaintiffs complain"); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 525 (1988) (Brennan, J., dissenting) ("[*Yearsley*] has never been read to immunize the discretionary acts of those who perform service contracts for the Government."); *Harris v. Kellogg, Brown & Root Servs., Inc.*, No. CV 08-563, 2016 WL 4720058, at *2 (W.D. Pa. Sept. 9, 2016) (noting that "[w]here, however, the contractor is hired to perform the same task, but is allowed to exercise discretion in determining how the task should be accomplished . . . the contractor is not entitled to derivative sovereign immunity" (quoting *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1241 (D. Or. 2010)); *Scainetti v. U.S. ex rel. Fed. Bureau of Prisons*, No. 01 CIV. 9970 (SHS), 2002 WL 31844920, at *3 (S.D.N.Y. Dec. 18, 2002) ("'[S]tripped to its essentials,' the government contractor defense is to claim '[t]he Government made me do it.'" (alteration in original) (quoting *In re Joint E. and S. Dist. N.Y. Asbestos Lit.*, 897 F.2d 626, 632 (2d Cir. 1990)).

Said another way, derivative sovereign immunity is a form of federal preemption, and immunizes contractors where state law conflicts with the direct, valid order of a federal official. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 646 (6th Cir. 2015) (noting that "the Supreme Court has cast *Yearsley* in terms of preemption"). But there is no conflict between this contract and Pennsylvania law, because the contract says nothing about *how* Mr. Banks or other Triple Canopy employees were to carry out their duties. Because Defendants offer no reason why it was impossible for them to carry out their duties in this instance without arguably violating Pennsylvania tort law, derivative sovereign immunity is inapplicable. *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d at 197 ("[D]erivative immunity will not preclude recovery for injuries occasioned by violation of state statutes if the entity could have abided by those statutes while implementing the agency's specifications.").

Finally, the same dispute of fact that precludes a dismissal based on official immunity also precludes a finding of derivative sovereign immunity for both defendants here. The parties contest

whether Defendants' actions in detaining and using force against Ms. Vangjeli exceeded the scope of their authority under the contract. A contractor is entitled to derivative sovereign immunity "only if it adhered to the terms of its contract with the government." *In re KBR, Inc.*, 744 F.3d at 345. Based on this dispute, a factfinder could conclude that the defendants failed to act in accordance with the terms of the contract, related task orders, or incorporated laws and regulations.

## CONCLUSION

This case clearly belongs in the realm of jury assessment and deliberation, and that is where it will head as soon as conditions permit. Thus, for the foregoing reasons, the Court denies the motion for summary judgment. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

11