IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZANA VANGJELI, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LINWOOD BANKS, *et al.*, | : | No. 19-1635 |
| *Defendants* | : | |

MEMORANDUM

PRATTER, J.                                                                         APRIL 5, 2023

Suzana Vangjeli asserts that she did not agree to the settlement agreement which Linwood Banks and Triple Canopy, Inc. now seek to enforce. For the reasons that follow, the Court concludes that there was no express authority for Ms. Vangjeli's counsel to agree to the material terms of the settlement.[1]

BACKGROUND

I.      Underlying Facts

Suzana Vangjeli alleges various torts stemming from her interaction with Linwood Banks, a security officer at the Social Security Administration Card Center in Philadelphia. Triple Canopy employs Mr. Banks and supplies security guards for the Card Center location. The dispute here started when Ms. Vangjeli attempted to enter the Card Center carrying a glass water bottle. A Triple Canopy guard (not Mr. Banks) who was stationed outside of the Card Center informed Ms. Vangjeli that she could not go in with the glass water bottle. After being told that she would have to leave the building to first throw the water bottle away before going in, Ms. Vangjeli stashed the

---

[1]      This case is in material respects an unfortunate by-product of the grave fundamental limitations inherent in other than in-person appearances, such as telephone or remote settlement or other conferences where documentation of positions or agreements or nuanced issues are at play. Those arrangements often work, but this case provides a cautionary tale that shows the enhanced chance for significant gaps in the communications when conducting legal proceedings this way.

water bottle out of the guard's sight. However, when she again approached the Card Center after stashing the water bottle, she was again told that she could not enter. Mr. Banks, who apparently found the water bottle, returned it to Ms. Vangjeli and explained that there were posted signs saying no glass bottles were allowed in the building.

What happened next is in dispute. According to Mr. Banks and Triple Canopy, Ms. Vangjeli began yelling and was told by Mr. Banks that if she wished to transact business at the Card Center in person she would have to come back the following day. Ms. Vangjeli denies that she was yelling and does not recall being told that she could not return the same day. The parties do agree that Ms. Vangjeli left the Card Center and actually then disposed of the water bottle outside of the building. When she attempted to enter the Card Center a third time, a guard stopped her but this time escorted her to a detention room. Ms. Vangjeli claims that she had a panic attack when the guard attempted to handcuff her. Shortly after being left alone in the room, Ms. Vangjeli left the detention area and approached the hallway leading to the Card Center. Although Ms. Vangjeli denies that she was trying to leave, guards saw her moving and interpreted it as an attempt to escape. Ms. Vangjeli alleges that Mr. Banks then tackled her, inflicting multiple injuries.

**II.    The Settlement**

At the request of all parties and counsel, the Court referred them to a very experienced and skilled magistrate judge for a settlement conference, which was held by telephone on September 23, 2022. The settlement conference reconvened on September 27, 2022—again by telephone— during which the parties reportedly reached a settlement agreement. After being informed by the magistrate judge simply that the matter had settled, the Court entered an order dismissing the case with prejudice pursuant to Rule 41.1(b) of the Local Rules of Civil Procedure.

Two days later, Ms. Vangjeli sent a letter to the Court stating that she did not agree with the settlement. The letter not only communicated Ms. Vangjeli's disagreement with the settlement,

but also that Ms. Vangjeli had made her disagreement known to her attorneys shortly after the September 27 settlement conference. In response, Mr. Banks and Triple Canopy sent a letter to the Court stating that during the September 27 settlement conference, then-counsel for Ms. Vangjeli, Iljaz Shehu, advised the parties and the magistrate judge that Ms. Vangjeli had agreed to settle the case for the amount proposed by Mr. Banks and Triple Canopy. Their letter to the Court expressed their understanding that Ms. Vangjeli had agreed to the material terms of their proposal and that they believed Mr. Shehu was authorized to accept the terms on her behalf.[2]

The Court then held a status hearing to address the settlement. The Court quickly discerned a conflict of interest between Ms. Vangjeli and her attorneys: Ms. Vangjeli's attorneys believed that she had expressly authorized them to settle, and Ms. Vangjeli maintained that she did not agree with the settlement. The Court granted the attorneys' motion to withdraw as Ms. Vangjeli's counsel and allowed Ms. Vangjeli more time to seek and retain new counsel. She did not do so.

The Court subsequently held an evidentiary hearing to assess whether counsel for Ms. Vangjeli had express authority to settle the case and had accepted the settlement on her behalf.

### III.    Ms. Vangjeli's September 29, 2022 Letter

The Court construes Ms. Vangjeli's September 29, 2022 letter to the Court essentially as a *pro se* motion to set aside the Order of dismissal under Federal Rule of Civil Procedure 60(b)(6). *Cf. Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 439 (3d Cir. 2021) ("Focusing on the substance of the filing over its form or label, we construe [the] 'motion to reopen' as we would a Rule 60(b)(6) motion."); *Ahmed v. Dragovich*, 297 F.3d 201, 208 (3d Cir. 2002) ("[W]e are free to recharacterize the motion to amend to match the substance of the relief requested."); *Ortho*

---

[2]    Mr. Banks and Triple Canopy subsequently filed motions to enforce the settlement. However, because the Court concludes that express authority did not exist and thus there is no settlement, the Court need not reach the merits of these pending motions to enforce. The Court deems as moot the motions to enforce the settlement in an order accompanying this Memorandum.

*Pharm. Corp. v. Amgen, Inc.*, 887 F.2d 460, 463 (3d Cir. 1989) (determining how to categorize a motion "from its substance and not from its form"); *Turner v. Evers*, 726 F.2d 112, 114 (3d Cir. 1984) (analyzing a motion based on its "function . . . not its caption"); *see also In re Burnley*, 988 F.2d 1, 2 (4th Cir. 1992) (construing an unnamed motion, which did not refer to a Federal Rule of Civil Procedure, as a Rule 60(b) motion for relief from a judgment or order based on the substance of the filing). Although Ms. Vangjeli was represented by counsel at the time she sent this letter to the Court, the letter demonstrates a clear conflict of interest between Ms. Vangjeli and her counsel regarding the settlement agreement.[3] Further, the letter shows Ms. Vangjeli's disavowal of the Court's Rule 41.1(b) dismissal order. She writes in relevant part: "DISAGREEMENT OF JUDGE'S SETTLEMENT ORDER[.] I, Suzana Vangjeli, the Plaintiff of the case above: DO NOT AGREE WITH THE JUDGE'S SETTLEMENT ORDER ABOVE." Pl.'s Sept. 29, 2022 Letter to Ct. at 1. Based on the substance of Ms. Vangjeli's letter and her apparent request for relief, the Court construes Ms. Vangjeli's letter as a Rule 60(b)(6) motion. *Cf. Anariba*, 17 F.4th at 439; *Ahmed*, 297 F.3d at 208.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(6) provides relief from a final judgment, order, or proceeding "for any other reason that justifies relief" beyond the reasons enumerated in Rule 60(b).[4] Rule 60(b) "vests power in courts adequate to enable them to vacate judgments whenever

---

[3]      In one of the emails included with the letter submitted to the Court, Ms. Vangjeli writes to Mr. Shehu, "You, better start on that motion, to withdraw your defense very soon, because I am not going to sign any document of 'Judge's Settlement Order.'" [sic] Pl.'s Sept. 29, 2022 Letter to Ct. at 3.

[4]      Rule 60(b) provides relief from a final judgment for the following reasons:

    (1) mistake, inadvertence, surprise, or excusable neglect;
    (2) newly discovered evidence that, with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b);
    (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
    (4) the judgment is void;

4

such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949). Courts should only exercise their powers under Rule 60(b)(6) in "*extraordinary circumstances* where, without such relief, an extreme and unexpected hardship would occur." *Cox v. Horn*, 757 F.3d 113, 120 (3d Cir. 2014) (emphasis added). The Court concludes that based upon an assessment of the testimonial evidence and the credibility of the witnesses, all as discussed below, this matter presents just such circumstances.

DISCUSSION

State law applies to determine counsel's authority for entering into a settlement on behalf of a client. Pennsylvania law, which requires express authority to settle, governs. Hence, Ms. Vangjeli's counsel needed express authority to settle.

## I.    Nature of the Claims and Jurisdiction

Ms. Vangjeli's claims are state law claims. She filed her complaint against Mr. Banks and Triple Canopy in the Philadelphia County Court of Common Pleas alleging three state law torts: (1) negligence in the form of negligent training, negligent hiring, failure to train, and failure to exercise due care; (2) assault and battery; and (3) false imprisonment. This Court also exercises federal question jurisdiction because Mr. Banks and Triple Canopy properly removed the case pursuant to the federal officer removal statute, 28 U.S.C. § 1442.[5]

---

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Motions for relief under Rule 60(b) "must be made within a reasonable time . . . [but] no more than a year after the entry of judgment or order or on the date of the proceeding." Fed. R. Civ. P. 60(c)(1). The Court entered the order of dismissal on September 27, 2022, and Ms. Vangjeli sent the letter—which the Court construes as a motion under Rule 60(b)(6)—on September 29, 2022. So, Ms. Vangjeli's application for relief is timely.

[5]    The federal officer removal statute allows federal government contractors, agents, and employees to remove actions from state court to federal court. 28 U.S.C. § 1442. District courts have federal

## II.    Authority Required for Settlement

Even where a court exercises federal question jurisdiction, state law still governs the question of an attorney's authority to settle. *See, e.g., Patterson v. GlaxoSmithKline Pharm. Co.,* No. 04-cv-4202, 2007 WL 966742, at *4 (E.D. Pa. Mar. 27, 2007) ("Our jurisdiction in this case is predicated upon the presence of a federal question. However, we apply Pennsylvania law to this issue [related to authority to settle] because the settlement of a lawsuit and the relationship between an attorney and his or her client are areas traditionally governed by state law and there is no conflicting federal interest." (internal quotation marks omitted)); *Mowrer v. Warner-Lambert Co.,* No. 98-cv-2908, 2000 WL 974394, at *5 (E.D. Pa. July 14, 2000) ("Although, in this case, jurisdiction is predicated upon the presence of a federal question . . . the court will apply Pennsylvania substantive law because the settlement of a lawsuit and the relationship between an attorney and his or her client are areas traditionally governed by state law and there is no conflicting federal interest.").

Here, the Court will apply Pennsylvania law to determine whether Ms. Vangjeli's attorney had authority to settle.[6] *See Patterson*, 2007 WL 966742, at *4.

---

jurisdiction under this statute where a federal defense is asserted. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 466–67 (3d Cir. 2015). Mr. Banks and Triple Canopy, who at the time were working as contractors to a federal agency (the Social Security Administration), asserted two federal defenses in their notice of removal: official immunity and derivative sovereign immunity. Mr. Banks and Triple Canopy, as federal contractors, were entitled not only to assert federal defenses but also to remove the case under the federal officer removal statute. So, removal was proper under 28 U.S.C. § 1442.

[6]     Pennsylvania choice of law rules govern here. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Pennsylvania choice of law rules "provide that the applicable law is that of the place with the most significant relationship to the parties and the transaction." *Tiernan*, 923 F.2d at 1033. Under this analysis, Pennsylvania law controls because the events giving rise to this lawsuit, and the settlement conferences relevant to the present dispute, all took place in Pennsylvania.

A.    **Pennsylvania Law Requires Express Authority for Settlement**

"The law in [Pennsylvania] is quite clear that an attorney must have express authority to settle a cause of action of the client."[7] *Rothman v. Fillette*, 469 A.2d 543, 545 (Pa. 1983); *accord Tiernan v. Devoe*, 923 F.2d 1024, 1033 (3d Cir. 1991). Express authority "does not arise merely from the fact of representation, but must be the result of explicit instructions regarding settlement." *Tiernan*, 923 F.2d at 1033. "The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly." *Reutzel v. Douglas*, 870 A.2d 787, 790 (Pa. 2005). Thus, a settlement is not binding in Pennsylvania if the attorney only has implied actual authority or apparent authority. *Id.*

"[T]here is a rebuttable presumption that 'a settlement entered into by an attorney has been authorized by the client.'" *Dugan v. O'Hara*, 125 F. Supp. 3d 527, 536–37 (E.D. Pa. 2015) (quoting *Rockey v. Big Spring Sch. Dist.*, 699 A.2d 1331, 1334 (Pa. Commw. Ct. 1997)). The

> presumption is fundamental to the effective functioning of our adversary system which is grounded, in part, upon two interrelated understandings: (1) that attorneys speak for their clients, both to the court and to opposing counsel, and (2) that attorney-client communications are privileged. Being able to rely upon counsels' representations of their clients' positions serves the salutary purpose of avoiding intrusion into the attorney-client relationship. Of course, there will be occasional situations where an attorney, by mistake or otherwise, will misrepresent a client's position. This can be easily determined and addressed by a fact-finding exercise, *once the client has come forward to deny the attorney's representations.*

*Rockey*, 699 A.2d at 1334 (emphasis in original). However, "rebuttal of the presumption will render the purported settlement ineffective." *Id.*; *see also Garabedian v. Allstates Eng'g Co., Div.*

---

[7]    Express authority is defined as

the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him. There is no authority unless there is power to affect the legal relations of the principal. . . . Further, the privilege must come from the manifestations of consent of the principal that the agent should act on account of the principal.

Restatement (Second) of Agency § 7 cmt. a (1958).

*of Allstates Design & Dev. Co.*, 811 F.2d 802, 803 (3d Cir. 1987). If the presumption is challenged, "the court must find that the attorney had express authority to settle." *Buchanan v. W. Whiteland Twp.*, No. 08-cv-462, 2009 WL 879038, at *2 (E.D. Pa. Mar. 31, 2009).

Where an attorney's authority to settle the case is in dispute, "a court may find express authority where the client delayed in asserting the lack of authority, or where it is clear that the real motive for challenging a settlement involved a change of heart." *Dugan*, 125 F. Supp. 3d at 537 (internal quotation marks omitted); *see e.g., Maloy v. Littman Jewelers*, No. 18-cv-3130, 2019 WL 3938252, at *2–3 (E.D. Pa. July 23, 2019), *report and recommendation adopted,* 2019 WL 3934925, at *1 (E.D. Pa. Aug 20, 2019) (treating plaintiff's contentions that she no longer wished to settle as a change of heart, and concluding that counsel had express authority, because he clearly and reasonably understood that he was authorized to settle based on lengthy discussions with the plaintiff regarding settlement).

Express authority will *not* be found where the client has repudiated his or her counsel's authority in a timely manner after settlement. *See Yarnall v. Yorkshire Worsted Mills*, 87 A.2d 192, 193 (Pa. 1952). "A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority." *Id.* Where no prompt action repudiates the settlement, the court can find express authority. *See Dugan*, 125 F. Supp. 3d at 537. Ratification can be as simple as the client communicating with her attorney about the settlement and not objecting to the settlement or the attorney's authority. *See e.g., Transp. Int'l Pool, Inc. v. Alt. Transp., Inc.*, No. 07-cv-2895, 2008 WL 2550598, at *6–*7 (E.D. Pa. June 25, 2008) (finding a valid settlement because the client had knowledge of the settlement from communications with counsel, and he had numerous opportunities to object to the settlement but did not do so).

**B.**     **The Evidence Here Establishes a Lack of Clarity Regarding Counsel's Express Authority to Settle Ms. Vangjeli's Claims**

"When the determination whether an attorney was authorized to settle a case hinges on factual issues and credibility determinations, a hearing should be held." *Transp. Int'l Pool*, 2008 WL 2550598, at *6 (citing *Garabedian*, 811 F.2d at 803). At the evidentiary hearing here to determine whether Mr. Shehu had express authority, Ms. Vangjeli, and Mr. Shehu and Todd B. Jacobs—former counsel for Ms. Vangjeli—all testified regarding the settlement conferences and the discussion of the settlement proposal. The Court saw and heard notable material gaps and inconsistencies in all of the witnesses' memory leading to a lack of clarity regarding the events at issue and suggesting credibility issues.[8] None of the witnesses here presented any documentary evidence to support the various versions of events to which the witnesses testified. Despite the credibility concerns of the Court germane to each witness, the Court finds the following facts.

Both settlement conferences were conducted via telephone. During the first, the witnesses agree that Ms. Vangjeli was physically present in Mr. Shehu's office listening to the actual settlement conference and contemporaneously communicating with Mr. Shehu. But during the second settlement conference, Ms. Vangjeli was not in Mr. Shehu's office nor was she on the telephone conference. Her knowledge of the negotiations was the result of her lawyer relaying the discussions to her and then relaying her supposed reactions to the magistrate judge. Ms. Vangjeli chose not to attend this settlement conference and instead had agreed to be available by telephone to discuss any settlement offers and to possibly authorize Mr. Shehu to accept them. During this

---

[8]     The Court surmises that this lack of clarity arises, at least in part, due to the remote and disjointed nature of the communications and the gaps that can unfortunately arise where as here, all parties were not contemporaneously talking to and with each other or participating in the same conference through the intermediatory who is directly speaking with the decision-makers. However, the magistrate judge in this case had no specific reason to know of this lack of clarity in the communications between Mr. Shehu and Ms. Vangjeli and thus had no reason to question Mr. Shehu when he communicated Ms. Vangjeli's agreement to the proposed settlement offer when counsel spoke to the magistrate judge.

September 27 settlement conference, Mr. Shehu called Ms. Vangjeli to convey the final settlement offer proposed by Mr. Banks and Triple Canopy. There is a considerable lack of clarity as to what happened after Mr. Shehu conveyed this offer to Ms. Vangjeli.

According to Mr. Shehu, he asked Ms. Vangjeli, after conveying the settlement offer, what she wanted to do. He testified that Ms. Vangjeli said that she wanted to settle: "I asked her 'I understand Suzana. With that being said, can we accept the [settlement amount].' And she said yes." Dec. 21, 2022, Evidentiary Hr'g Tr., at 27:5–7. Based on his understanding that Ms. Vangjeli had authorized him to accept the settlement, Mr. Shehu informed the magistrate judge that Ms. Vangjeli had accepted the settlement offer. The magistrate judge, relying on what the lawyers said, then informed both parties that the matter had settled.

After the settlement conference ended, Mr. Shehu promptly called Ms. Vangjeli to let her know that the case had settled for the amount discussed during their earlier phone call. According to Mr. Shehu, Ms. Vangjeli then told Mr. Shehu that she had "changed her mind" and no longer wanted to accept the settlement. Mr. Shehu told Ms. Vangjeli that, as her agent, he had already accepted the settlement on her behalf. Shortly thereafter, Mr. Shehu learned that the Court had entered an order dismissing the case with prejudice. Mr. Jacobs, the managing partner and Mr. Shehu's superior, then called Ms. Vangjeli to discuss the dismissal order with her. Mr. Jacobs similarly told Ms. Vangjeli that the case had settled, that the lawyers were of the view that Ms. Vangjeli had given Mr. Shehu authority to settle the case, and that the Court had dismissed the case. Mr. Shehu and Mr. Jacobs both testified in the evidentiary hearing that during the Jacobs-Vangjeli call, Ms. Vangjeli told them that she had "changed her mind" about the settlement.

According to Ms. Vangjeli, on the other hand, she did not remember ever telling Mr. Shehu that she accepted the proposed settlement amount. Rather, Ms. Vangjeli testified that she told Mr.

Shehu to go higher when he conveyed the settlement offer to her. On this point, Mr. Shehu,

however, testified that he did not recall Ms. Vangjeli telling him that she wanted to go higher. Ms.

Vangjeli testified that "Mr. Shehu got back with me saying that the final offer is [for the settlement

amount], let's do it. I said no, let's go higher . . . I changed my mind for the [settlement amount].

I don't recall saying I'm ok with the [settlement amount], but I remember saying that I changed

my mind." Dec. 21, 2022, Evidentiary Hr'g Tr., at 57:14–20. It is unclear whether Ms. Vangjeli

ever expressly told Mr. Shehu to accept the settlement.

At various points during the evidentiary hearing, Ms. Vangjeli testified that she "changed

her mind." However, it is also unclear what it is she had "changed her mind" about—accepting an

offer, the specific amount of a counter-demand, or the incremental amount "to go higher." The

following line of questioning is demonstrative:

> Q: So this would have been after the settlement conference, you agree with Mr.
> Shehu and Mr. Jacobs that you told both of them that you changed your mind?
> A: . . . I told Mr. Shehu to go higher. Let's try for higher. And Mr. Shehu said the
> only offer is [for the settlement amount]. And I said I changed my mind for the
> [settlement amount].
> Q: Okay. . . Before you told Mr. Shehu that you changed your mind, at some point
> prior to that, you told him that you would accept the [settlement amount] to settle
> the case, correct?
> A: I told Mr. Shehu to go higher than [the settlement amount].
> . . .
> Q: Is it your testimony that you never told Mr. Shehu that you would accept [the
> settlement amount] to settle the case?
> A: I don't remember saying that I am ok with the [settlement amount].
> Q: And then later you called him back and said you had changed your mind?
> A: Mr. Shehu called me and said the final offer is [the settlement amount] and I
> said I don't agree with that.
> Q: Okay. But if you say you changed your mind, doesn't that mean that at some
> point in time you had agreed with settlement for [the settlement amount]?
> A: I just said I don't agree. No change my mind.

Dec. 21, 2022 Evidentiary Hr'g Tr., at 57:21–58: 25. Adding to the confusion on this point, Ms.

Vangjeli also testified later in the hearing that she did not remember telling Mr. Shehu that she

changed her mind. Also, based upon the Court's observations of the witnesses, it is also very

possible that they have very different temperaments, modes of communicating, frames of reference and underlying assumptions and expectations.

### 1. Ms. Vangjeli Challenged the Rebuttable Presumption With Facts of Her Denial of the Settlement

Ms. Vangjeli has challenged the rebuttable presumption that a "settlement entered into by an attorney has been authorized by the client." *Rockey*, 699 A.2d at 1334. The facts of both Ms. Vangjeli's letter to the Court and the testimony elicited during the evidentiary hearing demonstrate that Ms. Vangjeli denied Mr. Shehu's representations on her behalf that she approved of the settlement.[9] *Id.* (concluding that whether an attorney has misrepresented a client's position can be determined "by a fact-finding exercise, once the client has come forward to deny the attorney's representations"); *see also Columbia Gas Transmission, LLC v. 520.32 Acres*, 188 F. Supp. 3d 500, 507 (W.D. Pa. 2016) (providing that "[s]ettlements entered into by attorneys are presumed to have been authorized by the client . . . [but] [t]he presumption of authority can be rebutted by factual evidence that the client would have objected to the attorney's conduct"); *Sawyer v. Sawyer*, No. 809 MDA 2016, 2017 WL 3476779, at *13 (Pa. Super. Aug. 14, 2017) ("If a client comes forward to challenge the authority of the attorney to perform an act <u>and</u> if he presents factual evidence that he objected or would have objected to the attorney's conduct, a court may examine the question of whether the attorney's actions were taken without express authority."). Because Ms. Vangjeli presented facts to rebut this presumption, the Court must determine whether Mr. Shehu had express authority to settle. *Buchanan*, 2009 WL 879038, at *2; *see also Sawyer*, 2017 WL 3476779, at *13.

---

[9]     Although there was contradictory testimony regarding the specific language Ms. Vangjeli used—that she changed her mind or that she did not agree—it was clear that all of the witnesses understood Ms. Vangjeli's statements to be an expression of disagreement with the settlement.

### 2. Mr. Shehu's Authority

Based on the evidence of record and the lack of clarity regarding the authority to settle, the Court cannot conclude that Mr. Shehu *ever* had express authority to accept the settlement agreement. Express authority "must be the result of *explicit instructions* regarding settlement." *Tiernan*, 923 F.3d at 1033 (emphasis added). However, the contradictory testimonial evidence from Mr. Shehu and Ms. Vangjeli, and the witnesses' professed lack of recollection as well as their demonstrated lack of communication compatibility, show that there was not a meeting of the minds between Ms. Vangjeli and Mr. Shehu as to what was actually said, and what was *meant* by what was said, with respect to the amount that Ms. Vangjeli would agree to settle the case for. So, the Court cannot find that Ms. Vangjeli gave Mr. Shehu "explicit instructions" to settle the case and it is simply *not* unambiguous that Mr. Shehu had express authority from Ms. Vangjeli to agree to the settlement.

Therefore, the Court concludes that there was no express authority to accept the material terms of the proposed settlement. In light of this, the Court concludes that there was no enforceable settlement. *See Tiernan*, 923 F.2d at 1035. Because the order of dismissal was entered based on the Court's understanding that the matter had settled, and that understanding was premised upon a mistake that was quickly raised with the Court, the Court sets aside its September 27, 2022 Order of dismissal under Rule 60(b)(6).

CONCLUSION

For the foregoing reasons, the Court concludes that there was no express authority to settle in terms of an unambiguous express authority to agree to the material terms that Mr. Banks and Triple Canopy seek to enforce. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

14